# Vice President of Sales Agreement

This agreement made this 21st day of March, 2006 by and between Bob Walder hereinafter referred to as the Vice President of Sales "**VPS**" and **American Diagnostic Medicine, Inc.,** a corporation under the laws of the State of Illinois, having its office at 960 Industrial Drive, Suite 7, Elmhurst, Illinois 60126, hereinafter referred to as "**ADM**", is as follows:

**1.   APPOINTMENT AND ACCEPTANCE:** ADM appoints VPS as its Vice President of Sales to sell the products and services of ADM in the territories and accounts or customers as set forth below and VPS accepts the appointment and agrees to exclusively sell and promote the sale of ADM's products and services.

**2.   TERRITORY:** VPS's territories and/or accounts shall consist of the following:

> All Hospitals, Multi-Specialty Clinics, Cardiology Practices and other Health Care Providers in the following geographic locations;
>
> Western Territory including Washington, Oregon, California, Arizona, Nevada.

**3.   COMPENSATION:** VPS compensation for services performed under the terms of this agreement shall be for the sale of certain medical diagnostic imaging equipment, whether through operating leases, joint ventures, traditional capital leases or outright purchases or other types of services supplied under the terms of this agreement. Please refer to **EXHIBIT A** for detailed information concerning compensation.

   **a.**   It is the responsibility of the VPS to obtain advanced authorization from ADM on all special circumstances involving compensation not covered by this Agreement.  Any special arrangements, which are agreed upon, by ADM and the VPS must be communicated in writing.
   **b.**   Sales efforts and in turn commissions due on all new accounts will be governed by the territories applicable to this agreement if the decision making / buying power resides within the territory for each specific customer and/or account.
   **c.**   The commission shall be paid to the VPS based on the schedule shown in **EXHIBIT A.** Commission checks shall be paid on a 1099 form to VPS.
   **d.**   ADM shall pay for or reimburse VPS for all travel costs relating to obtaining business under the terms of this Agreement.  Such travel costs may include, transportation (airfare, rental cars), mileage reimbursement, lodging, entertainment, phone calls, etc.). VPS shall provide to ADM at its principal office detailed expense reports on ADM expense report forms.  Each expense report shall detail the reason for travel and well as who was visited.  Expense reports turned in after thirty (30) days shall not be eligible for reimbursement.  All travel arrangements and costs must comply with ADM travel policies and be pre-approved by ADM.

**4.   ACCEPTANCE OF CONTRACTS:** All contracts are subject to acceptance or rejection by an authorized officer of ADM.  ADM shall be responsible for all credit risks and collections.  If ADM notifies customer of its acceptance or rejection of any contact, a copy shall be transmitted to the VPS.

**5.   TERMS OF SALE:** ADM shall provide VPS with a current price schedule / quotation, which shall be subject to change upon ninety (90) days notice.  Representative may quote to prospective customers from this price list provided but no quote shall be valid for more than ninety (90) days.  All other sales shall be at prices and upon terms established by ADM.  ADM shall have the right, in its sole discretion, from time to time, to establish, change, alter, or amend prices and other terms and conditions of sale. VPS shall not accept orders in ADM's name and shall not make price quotations or delivery promises for items not specifically on the current price


EXHIBIT A

information, file layouts, marketing strategies, business, product or acquisition plans, current business relationships or strategies and customer lists. "Proprietary Information" shall not include information which: (i) may be publicly disclosed by the party disclosing the information either prior to or subsequent to the receipt of such information by the receiving party; (ii) shall become generally known in the trade through no fault of the receiving party; (iii) may be lawfully disclosed to the receiving party by a third person to this Agreement who has lawfully acquired the Proprietary Information (iv) was independently developed by the receiving party; or (v) is required to be disclosed pursuant to a duly authorized subpoena, court order, or government authority, in which event the receiving party shall provide prompt written notice to the disclosing party prior to such disclosure, so that the disclosing party may seek a protective order or other appropriate remedy. In any event, the receiving party hereby acknowledges and agrees that, if such party shall seek to disclose, divulge, reveal, report, publish, transfer or use, for any purpose whatsoever, any Proprietary Information, such party shall bear the burden of proving that any such information is subject to one of the exceptions identified herein.

    **b.** Treatment of Information.

VPS acknowledges that, in and as a result of employment, and/or discussions with ADM's agents, vendors, officers and employees, VPS shall or may be making use of or acquiring Proprietary Information. As a material inducement to disclose such Proprietary Information, VPS covenants and agrees that it shall not, except with the prior written consent of ADM, at any time directly by itself or indirectly through any agent or employee: (i) copy, modify, disclose, divulge, reveal, report, publish or transfer to any person or entity, for any purpose whatsoever, any Proprietary Information or (ii) use Proprietary Information for any purpose other than in connection with the consummation of the Proposed Transactions in ADM's clinic best interest. Failure to mark any of the Proprietary Information as confidential protected or Proprietary Information shall not affect its status as part of the Proprietary Information under the terms of this Agreement.

    **c.** Ownership of Information.

VPS covenants and agrees that all right, title and interest in any Proprietary Information shall be and shall remain the exclusive property of ADM.

    **d.** Injunctive Relief.

VPS understands and agrees that ADM shall suffer irreparable harm in the event of a breach of any obligations under this Agreement and the monetary damages shall be inadequate to compensate ADM for such breach. Accordingly, VPS agrees that, in the event of a breach or threatened breach of any of the provisions of this Agreement, in addition to and not in limitation of any other rights, remedies or damages available at law or in equity, ADM shall be entitled to a temporary restraining order, preliminary injunction and permanent injunction in order to prevent or restrain any such breach.

    **e.** Materials.

All notes, data, tapes, reference items, sketches, drawings, memoranda, manuals, documentation, records and other materials in any way relating to any of the Proprietary Information or to ADM's business shall belong exclusively to ADM and VPS to turn over all copies of such materials and any Proprietary Information in the VPS's possession or control at the request of ADM.

    **f.** Nature of the Information.

Although the Proprietary Information contains information which is relevant for day-to-day operation of the company, ADM makes no representations or warranties, express or implied, as to the accuracy or completeness of the Proprietary Information. ADM shall not have any liability to the other party relating to or arising from the use of the Proprietary Information according to the terms of this Agreement. Neither party represents or warrants that Proprietary Information disclosed hereunder will not infringe any third party's patents, copyrights, trade secrets or other proprietary rights of others.

    **g.** Reasonableness of Restrictions; Severability.

EACH PARTY HAS CAREFULLY READ AND CONSIDERED THE PROVISIONS OF THIS SECTION HEREOF INCLUSIVE AND, HAVING DONE SO, AGREES THAT THE RESTRICTIONS SET FORTH IN SUCH ARTICLES ARE FAIR AND REASONABLE AND ARE REASONABLY REQUIRED FOR THE PROTECTION OF THE INTERESTS OF THE PARTIES AND ITS BUSINESS, OFFICERS, DIRECTORS

list, without ADM's approval.

**6. VPS'S RELATIONSHIP & CONDUCT OF BUSINESS:** VPS shall maintain its own sales organization within its assigned territories and shall use its best efforts and devote such time as may be necessary to sell and promote the sale of ADM's products and services and perform reasonable after-sale and follow-up functions as well as a liaison between ADM and customers within the territory. VPS agrees not to represent other companies while in employment with ADM or enter into a competitive business while under employment with ADM.

    **a.** Specific obligations of the VPS will include: Sales Lead Generation, Phone Solicitation, Written Sales Quotations, Contracts and Contract Negotiations, Sales Presentations, Trade Show Attendance and follow-up to potential customers.
    **b.** Any sales lead generated by VPS must immediately (within twenty-four hours) be conveyed via e-mail to the Sales Administrator. Follow-up calls, correspondences or sales quotes by the VPS must immediately (within twenty-four hours) conveyed via e-mail to the Sales Administrator. Weekly activity reports must be e-mailed no latter than 4:00 PM CST every Friday (No exception for holidays). Monthly forecast and outlooks must be e-mailed no later than 4:00 PM CST on the last business day of every month (No exception for holidays).
    **c.** VPS shall conduct all of his business in a professional manner in ADM's name and dress professionally and well groomed.
    **d.** The VPS shall not, without ADM's prior approval, alter, enlarge, or limit orders, make representations, guarantees concerning ADM's product and services or accept the return of, or make any allowances for such products and services whether written or orally.

**7. TERMINATION:** This agreement shall be enforce until canceled. Either party may cancel at any time, by giving written notice to the other party by email, fax or certified mail. Upon termination of this agreement the following applies;

    **a.** Any violation of the terms of this agreement shall be grounds for immediate termination and VPS shall not be eligible for any commissions owed on confirmed or pending contracts.
    **b.** If VPS elects to terminate this agreement and is not in violation of any of the terms of this agreement, ADM will compensate VPS for signed contracts not yet accepted at our own discretion. Electing to terminate this agreement, does not obligate ADM to make any further commission payments.
    **c.** If ADM terminates this agreement and VPS is not in violation of this agreement ADM will compensate the VPS at a rate which is mutually acceptable, but under no circumstance not to exceed 50% of the agreed upon compensation rate as detailed in Exhibit A for account still owed to VPS. Commissions will be paid no later than 30 days after the Delivery and Acceptance date. Accounts signed but not Accepted by customer within 90 (ninety) days of the termination date shall not be eligible for commissions. Commissions on all future contract renewals will not apply.

**8. NON-DISCLOSURE:** WHEREAS ADM is prepared to disclose certain confidential information regarding the formation, financing, acquisitions, and operations of its accounts concerning diagnostic imaging and other related business in the United States. And, WHEREAS ADM under this agreement wishes to protect this information by insuring that it not be disclosed to anyone without their written permission, and WHEREAS the signatories wish to spell out the exact methods by which they will protect this information. NOW THEREFORE, the signatories mutually covenant and agree as follows:

    **a.** Definition of Proprietary Information.
For purposes of this Agreement, the term "Proprietary Information" shall mean all of the information, data and software furnished by ADM to VPS, whether in oral, written, graphic or machine-readable form, which may include but not be limited to names of other entities interested in acquiring an ownership interest in ADM, financial statements, corporate and stock

AND EMPLOYEES. Each party further agrees that the restrictions set forth in this Agreement shall not impair either party's ability to do business within field or fields of its choice including, without limitation, those areas in which such party is, to be or has done business. The provisions of this Agreement shall be deemed severable, and invalidity or unenforceability of any one or more of the provisions hereof shall not affect the validity and enforceability of the other provisions hereof.

**9. NOT COMPETE:** For good consideration and as an inducement for ADM to employ VPS, VPS hereby agrees not to directly or indirectly compete with the business of ADM and its successors and assigns during the period of employment and for a period of 1 year following the termination of VPS and notwithstanding the cause or reason for termination. The term "not compete" as used herein shall mean that the VPS shall not own, manage, operate, consult or to be employee in a business substantially similar to or competitive with the present business of ADM or such other business activity in which ADM may substantially engage during the term of employment.

**10. SETTLEMENT OF DISPUTES:** The parties agree that any disputes or questions arising hereunder including the construction or application of this agreement may be settled by arbitration in accordance with the rules of the American Arbitration Association then enforce. The American Arbitration Association shall name a panel of five arbitrators and ADM shall then strike two names and the remaining names shall be the arbitrator. The decision of the arbitrator shall be final and binding upon the parties both as to law and to fact and shall not be appealable to any court in any jurisdiction. Both parties shall share the expenses of the arbitrator equally unless the arbitrator determines that the expenses shall be otherwise assessed. The prevailing party in any lawsuit shall recover reasonable attorney fees and costs incurred from each other.

**11. GENERAL:** This agreement contains the entire understanding of the parties, and shall supersede any other oral or written agreement and shall insure to the benefit of ADM or any of its successors and assigns. This agreement may not be modified in any way without consent of both parties. Nothing in the agreement shall be construed to constitute the VPS as the partner of ADM nor shall either party have any authority to bind the other in any respect, it being intended that each shall remain an independent contractor responsible for only its own actions.

**12. CONSTRUCTION OF AGREEMENT:** This agreement shall be construed according to the laws of the state of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first written in multiple counterparts, each of which shall be considered an original.

ADM:

**American Diagnostic Medicine, Inc.**

Printed Name:_____

Signature:_____

Title:_____

VPS: Vice President of Sales

Signature: _[signature]_____

# EXHIBIT A
*Compensation & Commission Rates*

**VPS Compensation:**
ADM shall pay VPS a base annually salary of $132,000.00 to be paid bi-monthly on the 1st and 15th of each calendar month.

**Employee Benefits:**
- Health Insurance & Drug Prescription
- Dental Insurance
- Retirement Fund – Company 401(k), non-matching
- Short Term & Long-Term Disability
- Life Insurance
  (Please contact Janet Hausenbauer at 800.262.9645, ext. 109 for additional details of benefits & cost)

**Paid Vacation:**
- Two (2) weeks paid vacation after the first 12 months of employment
- Three (3) weeks paid vacation after 5 years of employment
- Four (4) weeks paid vacation after 10 years of employment
- Paid Holidays including New Years Day, Memorial Day, Labor Day, July 4th, Thanksgiving Day and Christmas Day.
- Each Employee receives 3 sick days and 2 personal days per year

**Other Incentives:**
- Car allowance of $500.00 monthly to be paid bi-monthly on the same schedule as VPS compensation listed above

**Fee- per-Exam Operating Leases**
**Fixed Site Commission Schedule**

**Commissions paid on new nuclear fixed site accounts:**
- 60 month contract w/ minimums         10,000
- 48 month contract w/ minimums          8,000
- 36 month contract w/ minimums          6,000
- 24 month contract                      4,000
- 12 month contract                      2,000

**Commissions paid on new 64 slice CT fixed site accounts (50% until September 30, 2006, 100% thereafter):**
- 60 month contract w/ minimums         15,000
- 48 month contract w/ minimums         12,000

**Commissions paid to vice president of sales on fixed site contract by sales rep (paid upon D&A):**
- 60 month w/minimums                    1,000
- 48 month w/ minimums                     800
- 36 month contract                        600
- 24 month contract                        400
- 12 month contract                        200

# EXHIBIT A
*Compensation & Commission Rates*

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.
The commissions will be paid to the TSR based on the following payment schedule:
- 25% paid upon signed contract and credit approval
- 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.
- 25% paid in the pay period after 2 full scanning months and based on the following criteria
    1. Patient volume at site must be 51-74% of what is projected to receive 50% of back end commission
    2. Patient volume at 75-99% will receive 75% of back end commission
    3. Patient volume at 100-124% will receive the full back end commission
    4. Patient volume 125- 150% will receive 125% of back end commission
    5. Patient volume at >150% will receive 150% of back end commission

### Fee- per-Exam Operating Leases
### Mobile Commission Schedule

**Commissions paid on new mobile accounts:**
- 12 month contract  w/ 4 days/month         4,000
- 12 month contract  w/ 3 days/month         3,200
- 12 month contract  w/ 2 days/month         2,000
- 12 month contract  w/ 1 day/month            800

**Commissions paid to vice president of sales on new mobile contract by sales rep (paid upon D&A):**
- 12 month contract  w/ 4 days/month          500
- 12 month contract  w/ 3 days/month          375
- 12 month contract  w/ 2 days/month          250
- 12 month contract  w/ 1 day/month           125

**Commissions paid on renewed mobile accounts:**
- 12 month contract  w/ 4 days/month         2,000
- 12 month contract  w/ 3 days/month         1,600
- 12 month contract  w/ 2 days/month         1,000
- 12 month contract  w/ 1 day/month            400

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.
The commissions will be paid to the TSR based on the following payment schedule:
- 50% paid upon signed signed contract and credit approval

- 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.

*ADM reserves the right to change or modify the commission rates and payment schedule with 30 days advance notice to the VPS.*

**AGREED AND ACCEPTED:**          **AGREED AND ACCEPTED:**

ADM                                VPS        Bob Walder

Signature:_____  Signature: _____