NF

FILED

DECEMBER 10, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN DIAGNOSTIC MEDICINE, INC., | ) | |
| Plaintiff | ) | |
| | ) | No. 07 C _____ |
| v. | ) | |
| | ) | |
| ROBERT WALDER, PAUL KAPLAN, BRANDON WALTON, and CORE MEDICAL IMAGING LLC | ) | **07 C 6947** |
| | ) | |
| Defendants | ) | JUDGE COAR |
| | | MAGISTRATE JUDGE NOLAN |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION AND ORDER PERMITTING EXPEDITED DISCOVERY

1.      Plaintiff American Diagnostic Medicine, Inc. ("ADM") respectfully move this Court for a Temporary Restraining Order and a Preliminary Injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure.

2.      ADM concurrently filed a Complaint in this action with the Court, which is incorporated herein by reference.

3.      ADM has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of this lawsuit.

4.      As set forth in ADM's Complaint, ADM is seeking to restrain and enjoin defendants Robert Walder ("Walder") and Paul Kaplan ("Kaplan") from further breaching their non-disclosure and non-compete agreements with ADM until such time as this Court can decide the merits of this dispute.  Further, ADM seeks to restrain Walder, Kaplan, and defendants Brandon Walton ("Walton") and Core Medical Imaging LLC ("CMI") (together, "Defendants") from using ADM's confidential financial information, marketing, business, product or acquisition strategies, customer pricing for services and products, customer lists, and contract renewal dates, contract and account numbers, and contract values ("Confidential Information") and from competing against ADM.

5.     As set forth in ADM's Complaint, unless injunctive relief is granted, preventing Walder and Kaplan from converting and using ADM's Confidential Information, ADM will be immediately irreparably harmed by:

(a)     Disclosure and use of ADM's Confidential Information;

(b)     Loss of confidentiality of client records, loss of client confidence and trust, loss of goodwill, and loss of business reputation;

(c)     Damage to office morale and stability, and the undermining of office protocols and procedures; and

(d)     Present economic loss, which is unascertainable at this time, and future economic loss, which is incalculable.

6.     ADM has no adequate remedy at law.

7.     The threat of irreparable injury is imminent and ongoing.  As set forth in the Memorandum of Law in Support of ADM's Motion for a Temporary Restraining Order and a Preliminary Injunction, courts considering circumstances similar to those herein have repeatedly granted injunctive relief to preclude the misappropriation of confidential and proprietary trade secret information prior to an adjudication on the merits.

8.     Any delay in granting to ADM the injunctive relief requested herein would result in ADM sustaining irreparable harm and the destruction of the status quo pending arbitration.

WHEREFORE, ADM respectfully prays that this Court ORDER and DECREE that until such time as this Court specifically orders otherwise:

A.     Defendants Walder and Kaplan be immediately enjoined and restrained, directly or indirectly, and whether alone or in concert with others, including any officer, agent employee, and/or representative of Defendants' new employer, Core Medical Imaging, LLC, until hearing and thereafter until further Order of this Court, from doing any of the following:

(1)     directly or indirectly competing with ADM until one year after Walder and Kaplan's separation/termination from ADM;

2

(2)     using, disclosing or transmitting for any purpose any Confidential Information belonging to or concerning ADM, its customers or employees, including the names, addresses and phone numbers of ADM customers and employees, and other confidential information, trade secrets and commercially sensitive materials belonging to ADM;

(3)     retaining any of ADM's personal and/or Confidential Information.

B.     Defendants, and all those acting in concert with them, including but not limited to the directors, officers, employees and agents of CMI, be ordered to return all records and documents in whatever form (whether original, copied, computerized, or handwritten) containing ADM's Confidential Information, including, ADM's financial information, marketing, business, product or acquisition strategies, customer pricing for services and products, customer lists, and contract renewal dates, contract and account numbers, and contract values in Defendants' possession, custody and control, within twenty-four hours of notice to Defendants or their counsel of the terms of this Order.

C.     ADM be granted leave to take expedited discovery prior to the Preliminary Injunction hearing.

Dated:  December 10, 2007

JOSHUA A. ALDORT
CLAUSEN MILLER P.C.

JAMES F. SMITH
JOSHUA A. ALDORT
CHRISTOPHER R. HENSON
CLAUSEN MILLER P.C.
Firm I.D. No. 90181
10 South LaSalle Street
Chicago, Illinois  60603-1098
312/855-1010
Attorneys for Plaintiff, AMERICAN DIAGNOSTIC MEDICINE, INC.

1157753.1

NF

FILED

DECEMBER 10, 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN DIAGNOSTIC MEDICINE, INC., | ) | |
| Plaintiff | ) | |
| | ) | No. 07 C _____ |
| v. | ) | |
| | ) | |
| ROBERT WALDER, PAUL KAPLAN, BRANDON WALTON, and CORE MEDICAL IMAGING LLC | ) | **07 C 6947** |
| Defendants | ) | JUDGE COAR |
| | ) | MAGISTRATE JUDGE NOLAN |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Plaintiff American Diagnostic Medicine, Inc. ("ADM") submits the following memorandum of law in support of its motion for a temporary restraining order and a preliminary injunction. ADM seeks to restrain and enjoin defendants Robert Walder ("Walder") and Paul Kaplan ("Kaplan") from further breaching their non-disclosure and non-compete agreements with ADM until such time as this Court can decide the merits of this dispute. Further, ADM seeks to restrain Walder, Kaplan, and defendants Brandon Walton ("Walton") and Core Medical Imaging LLC ("CMI") (together, "Defendants") from using ADM's confidential financial information, marketing, business, product or acquisition strategies, customer pricing for services and products, customer lists, and contract renewal dates, contract and account numbers, and contract values ("Confidential Information") and from competing against ADM.

## PRELIMINARY STATEMENT

This application for injunctive relief arises from the unlawful misappropriation and use by Defendants of certain property and/or business interests of ADM. Walder and Kaplan, both former employees of ADM, have breached their respective employment agreements by: 1) forming and operating CMI, an ADM competitor, while still employed by ADM; 2) misappropriating and

disclosing ADM's Confidential Information without ADM's written authorization, and for the benefit of CMI; 3) competing directly against ADM within a year after ADM terminated their employment; and 4) refusing to return all of ADM's property.  Together, Walder and Kaplan teamed up with Walton and formed CMI, where upon information and belief, they are using ADM's Confidential Information to solicit ADM's employees and to divert existing ADM customers.

Defendants' activity constitutes breach of contract, conversion, misappropriation of trade secrets, breach of the duty of loyalty, and other actionable misconduct.  Walder and Kaplan have acknowledged that such wrongdoing threatens ADM with irreparable harm in a variety of ways, including present and future economic loss, disclosure of proprietary and confidential business and customer information, loss of goodwill and business reputation, and injury to office stability.  For the reasons set forth below, ADM's motion for a temporary restraining order and preliminary injunctive relief should be granted.

## BACKGROUND FACTS

As set forth in the accompanying Kancherlapalli Affidavit, Walder was hired by ADM as its Vice President of Sales from March 2006 to October 2007, when ADM terminated his employment. Kaplan was hired by ADM as a Territory Sales Representative from May 2006 to December 2007, when Kaplan resigned.  During the course of Walder and Kaplan's employment at ADM, they became privy to ADM's Confidential Information.

At the inception of their employment with ADM, Walder and Kaplan entered into employment agreements, which are nearly identical in all material respects (Walder's agreement is referred to herein as "VPS Agreement" and Kaplan's agreement is referred to herein as "TSR Agreement").  (A copy of the VPS Agreement and TSR Agreement are attached to the Kancherlapalli Aff. as Exhibits A and B.)

2

1157762.1

In Section 6 of the VPS Agreement and TSR Agreement, both Walder and Kaplan, "agree[s] not to represent other companies while in employment with ADM or enter into a competitive business while under employment with ADM."

In Section 8 of the VPS Agreement and TSR Agreement, both Walder and Kaplan agree that certain ADM information they receive during the course of their employment is confidential, and they will not disclose such information to any third party. Further Walder and Kaplan acknowledge that "ADM will suffer irreparable harm in the event of a breach of the VPS [or TSR] agreement and that monetary damages shall be inadequate to compensate ADM for such breach."

Section 9 of the VPS Agreement and TSR Agreement, contains a one year non-compete agreement whereby both Walder and Kaplan agree to not compete directly or indirectly against ADM during their period of employment and for a period of one year following their termination. In consideration of such covenant, ADM agreed to, and in fact did, provide substantial compensation to Walder and Kaplan. ADM provided them with the following additional benefits: participation in ADM's 401(k) plan and ADM's retirement plan, comprehensive health and dental benefits, office and support facilities, access to and opportunities for continuing training, computer equipment, etc.

After ADM terminated Walder in October 2007, it learned that in July 2007, Walder solicited an ADM employee on behalf of a new company, CMI. As part of his solicitation, Walder asked the ADM employee to sign a "Confidentiality and Non-Disclosure Agreement" ("CMI's NDA") and provided the employee with ADM's highly confidential financial information. (A copy of CMI's NDA and ADM's Confidential Information Walder disclosed to ADM's employee are attached to the Kancherlapalli Aff. as Exhibit C.) As CMI's NDA reflects, Walder and Kaplan were CMI's principals while still employed by ADM. Further, CMI is in the same business as ADM.

3

Notwithstanding the express covenants made by Walder and Kaplan, they have irrevocably damaged ADM by: 1) forming and operating CMI, an ADM competitor, while still employed by ADM; 2) misappropriating and disclosing ADM's confidential and proprietary information without ADM's written authorization, for the benefit of CMI; 3) competing directly against ADM within a year after ADM terminated their employment; and 4) refusing to return all of ADM's property.

ADM seeks only to maintain the status quo until such time as this Court can issue a decision on the merits. ADM has simultaneously commenced a lawsuit against Defendants.

## ARGUMENT

I.      ADM IS ENTITLED TO INJUNCTIVE RELIEF

A.      Introduction

The standards for obtaining a temporary restraining order and preliminary injunctive relief in this Court are well established. The two standards are identical. *Long v. Board of Education*, 167 F. Supp.2d 988, 990 (N.D. Ill. 2001); *Charter National Bank and Trust v. Charter One Financial, Inc.*, 2001 WL 527404 (N.D. Ill., May 15, 2001). A temporary restraining order is warranted if the party seeking the injunction can make a threshold showing that: 1) the case has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if the injunction is not granted; 4) the balance of hardships is in favor of the moving party; and 5) the preliminary injunction will not harm the public interest. *Rust Environment & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1213 (7th Cir. 1997). The court, when considering all of these factors, should apply a "sliding scale" approach -- "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harm need favor the plaintiff's position." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

Moreover, Illinois courts have also recognized that a valid and signed restrictive covenant imposes a fiduciary duty upon even a non-officer employee and that this duty survives the

4

termination of the employment relationship. *Labor Ready, Inc. v. Williams Staffing, LLC*, 149

F.Supp.2d 398, 414 (N.D.Ill. May 31, 2001).

Further, in the VPS and TSR Agreements, Walder and Kaplan acknowledge that a breach of

their non-disclosure and non-compete provisions will cause ADM irreparable harm. Such breaches

entitle ADM to a temporary restraining order, temporary injunction and permanent injunction

against Defendants.

B.    ADM Satisfies All Requirements For Injunctive Relief

The first requirement to obtain an injunction is to show a reasonable likelihood of success on

the merits. In this case, ADM is likely to succeed on the merits. In *Lawrence and Allen. Inc. v.*

*Cambridge Human Resource Group*, 292 Ill. App. 3d 131, 685 N.E.2d 434 (2d Dist. 1997), the

Illinois Appellate Court articulated two threshold requirements for the enforcement of restrictive

covenants. First, the covenant must be ancillary to a valid relationship and subordinate to the

relationship's main purpose. *Lawrence and Allen*, 292 Ill. App. 3d at 137. The VPS Agreement

and TSR Agreement between ADM and Walder and Kaplan, satisfies this requirement. *Id.*

The restrictive covenant also must be supported by adequate consideration. *Id.* at 137-38.

Continued employment constitutes sufficient consideration. *Lyle R. Jager Agency, Inc.*, 625 N.E.2d

at 399. *See also Applied Micro, Inc. v. Sun Fulfillment, Inc.*, 941 F.Supp. 750, 753 (N.D. Ill. 1996)

("Continued employment for a substantial period, in the case of a covenant signed after the

employee begins work, has consistently been deemed sufficient consideration for the agreement not

to compete.") In this case, where ADM provided numerous benefits (enumerated above) to both

Walder and Kaplan during the course of their continued association with ADM, this requirement

also is met.

Once the threshold requirements are met, additional considerations apply. Under controlling

Illinois law, a restrictive covenant is enforceable if the terms of the agreement are reasonable and

necessary to protect a legitimate business interest of the employer. *RKI, Inc. v. Grimes*, 177 F. Supp.2d 859, 877 (N.D. Ill. 2001); *Capsonic Group v. Swick*, 181 Ill. App. 3d 988, 992-93, 537 N.E.2d 1378 (2d Dist. 1989); *A.B. Dick Company v. American Pro-Tech*, 159 Ill. App.3d 786, 792, 514 N.E.2d 45 (1st Dist. 1987). A restrictive covenant's reasonableness is measured by its hardship to the employee, its effect upon the general public, and the reasonableness of the time, territory, and activity restrictions. *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 17, 619 N.E.2d 1337 (2d Dist. 1993). A legitimate business interest exists if either: (1) there are "near permanent business relationships" with customers, or (2) the defendant had access to trade secrets or other confidential information of the employer by virtue of his or her employment. *Lawrence and Allen, Inc.*, 292 Ill. App. 3d at 141. *See also Hanchett Paper Company v. Melchiorre*, 341 Ill App. 3d 345, 351, 792 N.E.2d 395 (2d Dist. 2003).

In this case, ADM satisfies the second *Lawrence and Allen* test, because Walder and Kaplan had access to ADM's Confidential Information and trade secrets. Walder and Kaplan specifically covenanted in Section 8 of their VPS and TSR Agreements that certain information regarding ADM's formation, financials, acquisitions, marketing strategies, customer lists and operations are proprietary to ADM. Moreover, this information qualifies as a trade secret under the Illinois Trade Secrets Act, 765 ILCS 1065, *et seq*. That statute, enacted in Illinois in 1988, defines a trade secret as, *inter alia*, financial data or a list of actual or potential customers that:

is sufficiently secret to derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 765 ILCS 1065/2(d).

ADM's Confidential Information is a trade secret under the Illinois Trade Secrets Act. The economic value of the information is beyond dispute. As set forth in the Kancherlapalli Affidavit,

Walder and Kaplan had access to ADM's Confidential Information, including, but not limited to, ADM's marketing, business, product or acquisition strategies, customer pricing for services and products, customer lists, and contract renewal dates, contract and account numbers, and contract values. This information is not generally known to, or readily ascertainable by, ADM's competitors. Moreover, as detailed in the Kancherlapalli Affidavit, ADM has adopted strict security procedures to maintain the confidentiality of its customer and business information. The case for a finding that customer information qualifies as a "trade secret" increases substantially when the company has taken significant steps to limit its accessibility within the organization. For instance, in *Elmer Miller, Inc. v. Landis*, 253 Ill. App.3d 129, 133, the Appellate Court, First Division, was swayed by the fact that the information in question was carefully guarded on a "need-to-know" basis and was not made available to other employees, who did not service the accounts in question.

It is important to note that Illinois courts explicitly have pronounced that an employer may have a protectible interest in confidential information even if it doesn't rise to the level of a trade secret. As the Appellate Court, First Division, clearly stated in *A.B. Dick Company*, 159, 111 App.3d 786 at 793, "trade secrets or other confidential information are not necessary to establish a protectible interest." Rather, the requisite determination that the employer had a protectible interest is satisfied in cases in which "the employee acquired confidential information through his employment and subsequently attempted to use it for his or her own benefit," *Id.*, or in which "but for the association with the employer, the employee would not have had contact with the customers." *Id.* Both of these statements apply in the context of the Defendants' activities: both Walder and Kaplan, wrongfully seek to misuse information that was not available to them prior to their association with ADM, and to contact customers whose identities would have remained unknown to them but for their association with ADM. *See also Outsource International*

7

*Incorporated v. Barton*, 192 F.3d 662, 669 (7th Cir. 1999) (enforcing a restrictive covenant to enjoin a former employee of a temp agency from using information obtained during his employment and starting his rival agency, staffed largely by fellow employees encountered during his time at the initial agency.)

Finally, ADM has shown a reasonable likelihood of success on the merits, because the one-year restrictive covenant at issue in this action is reasonable, both temporally and as to scope of activity. See e.g., *Millard Maintenance Serv. Co. v. Bernero*, 207 111. App. 3d 736, 750, 566 N.E.2d 379 (1st Dist. 1990) (finding a two-year time restriction in a noncompetition covenant reasonable); *RKI, Inc. v. Grimes*, 177 F. Supp.2d 859, 877 (N.D. 111. 2001) (finding three-year time restriction reasonable). See, *Health Professionals, Ltd. v. Johnson, MD*, 339 Ill. App.3d 1021, 1037, 791 N.E.2d 1179 (3d Dist. 2003) ("The courts of this State have repeatedly held 3-year restrictions as reasonable . . as well as those of longer duration."). Moreover, when a restrictive covenant is formulated with a specific customer base in mind, this effectively eliminates the need for any geographic restriction. See, e.g., *Rubin Response Services, Inc. v. Dunning*, 1990 WL 7084 (N.D. 111.1990) at *3 ("A covenant not to compete directed toward the preservation of customers need not be limited geographically if there is a protectible interest that the former employer has in his client base."). Overall, ADM has met the first test to obtain injunctive relief - it has shown a reasonable likelihood of success on the merits.

ADM also has met the second and third tests -- namely, that no adequate remedy at law exists, and ADM will suffer irreparable harm if no injunctive relief is granted. This is true in four respects. First, Walder and Kaplan acknowledge in the VPS and TSR Agreements, that a breach of their non-disclosure and non-compete provisions will cause ADM irreparable harm, with no adequate remedy at law. Second, it is impossible to determine the extent of ADM's future economic loss, in the absence of an injunction. It is not clear which Confidential Information Defendants

8

possess and the nefarious ways in which Defendants plan on using it. If such information is disclosed to an ADM competitor, it would provide said competitor a substantial commercial advantage it otherwise would not have.

A third aspect of irreparable harm, and inadequacy of a legal remedy, is the loss of client confidence that will occur absent an injunction. The loss of confidence will occur because these clients will have their reasonable expectation of privacy destroyed. ADM clients expect their financial information to be kept confidential. If Defendants' conduct continues unrestrained, the clients' trust and confidence in ADM will be permanently impaired in a way that cannot be quantified.

Finally, ADM can show that the balance of hardships tips in its favor, and the public interest will not be harmed by issuance of an injunction. Indeed, the benefit of injunctive relief to ADM significantly out-weighs any possible hardship to Defendants. On the one hand, an injunction would protect ADM's goodwill, business reputation, methods of business operation, customer operational and financial information and contract rights. Moreover, an injunction would promote the public interest by upholding the sanctity of business contracts and the confidentiality of client records. At least one Illinois court has recognized the necessity of fostering an expectation on the part of both employers and employees that non-competition clauses will be binding once they are signed. See, e.g., *Arcadia Health Services, Inc. v. A+ Health Care, Inc.*, 1997 WL 24737 at *5 (N.D. Ill. 1997) (emphasizing that the injunction serves the public interest because otherwise "non-competition clauses would be viewed by other representatives as non-binding"). By contrast, Defendants have no equities on their side. They have intentionally breached their contractual commitments and have deliberately misappropriated ADM's Confidential Information. As noted by the United District Court for the Northern District of Illinois, the public has an interest in preventing unfair competition, commercial piracy, misleading solicitations and in safeguarding the

9

1157762.1

confidentiality of financial records.  Consequently, the public interest has been disserved by

defendants' actions. The public has no interest in destroying contracts, rewarding theft, and

encouraging unethical business behavior.  *IDS Financial Services*, supra, 958 F. Supp. at 1282.

Overall, ADM has met the fourth and fifth requirements to obtain injunctive relief, and its

application should be granted.

## CONCLUSION

For all of the reasons set forth above, ADM's application for a temporary restraining order

and for preliminary injunctive relief should be granted.


Dated: December 10, 2007

                                        _____
                                        JOSHUA A. ALDORT
                                        CLAUSEN MILLER P.C.

JAMES F. SMITH
JOSHUA A. ALDORT
CHRISTOPHER R. HENSON
CLAUSEN MILLER P.C.
Firm I.D. No. 90181
10 South LaSalle Street
Chicago, Illinois 60603-1098
312/855-1010

Attorneys for Plaintiff, AMERICAN DIAGNOSTIC MEDICINE, INC.

10

1157762.1

NF

**FILED**

**DECEMBER 10, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AMERICAN DIAGNOSTIC )
MEDICINE, INC., )
               Plaintiff )
                )     No. 07 C _____
    v. )
                )
ROBERT WALDER, PAUL KAPLAN, )
BRANDON WALTON, and CORE )
MEDICAL IMAGING LLC )
                )
            Defendants )

**07 C 6947**

**JUDGE COAR**
**MAGISTRATE JUDGE NOLAN**

## AFFIDAVIT OF MR. SAMUEL KANCHERLAPALLI

    I, SAMUEL KANCHERLAPALLI, first being duly sworn, on oath depose and state as follows:

    This affidavit is made of my own personal knowledge, and, if sworn as a personal witness in the above captioned cause, I would competently testify as follows:

    1.    At all times pertinent to this litigation, I was Chief Executive Office of American Diagnostic Medicine, Inc.

    2.    On March 21, 2006, ADM hired Robert Walder ("Walder") as ADM's Vice President of Sales. That same day, Walder executed an agreement titled, Vice President of Sales Agreement. ("VPS Agreement")(A copy of the VPS Agreement is attached hereto as Exhibit A.)

    3.    On May 8, 2006, ADM hired Kaplan as an ADM Territory Sales Representative. That same day, Kaplan executed an agreement titled, Territory Sales Representative Agreement ("TSR Agreement")(A copy of the TSR Agreement is attached hereto as Exhibit B.).

    4.    During the course of Walder and Kaplan's employment at ADM, they became privy to ADM's confidential business, financial and operational information ("Confidential Information").

    5.    ADM took numerous steps to maintain the confidentiality of its Confidential Information. Specifically, it limits access to its Confidential Information to employees on a "need-to-know" basis. It protects its on-line Confidential Information by limited access by password. It protects its hard copies of its Confidential Information by limiting access to it and by securing same in locked offices and cabinets. It strictly limits access to its financial Confidential Information to a few key management personnel. It strictly limits access to its complete customer list to a few key management personnel and ADM's VP of Sales. ADM discloses relevant portions of its customer list to its salesperson that has responsibility for that sales territory.

1158322.1

6.    On October 17, 2007, ADM terminated Walder's employment for poor management style and a subpar sales record.

7.    After ADM terminated Walder, it learned that in July 2007, Walder solicited an ADM employee on behalf of a new company, Core Medical Imaging LLC ("CMI"). As part of his solicitation, Walder asked the ADM employee to sign a "Confidentiality and Non-Disclosure Agreement" ("CMI's NDA") and provided the employee with ADM's highly confidential financial information. (A copy of CMI's NDA and ADM's Confidential Information Walder disclosed to ADM's employee are attached hereto as Exhibit C.)

8.    As CMI's NDA reflects, Walder and Kaplan were CMI's principals while still employed by ADM. Further, CMI is in the same business as ADM.

9.    Upon information and belief, on October 2007, Walder, Kaplan and Brandon Walton incorporated CMI in the state of California.

10.    On December 3, 2007, while ADM was reviewing the extent of Defendants' illegal conduct, Kaplan tendered his resignation to ADM.

11.    As a result of Walder and Kaplan's breaches of the VPS Agreement an TSR Agreement, ADM has sustained, and will continue to sustain, severe and irreparable injury to the value of its confidential information, customer goodwill, customer loyalty, and competitive advantage, all of which ADM has expended significant time, money, and effort to secure. Unless Walder and Kaplan are restrained and enjoined from further breaches of the VPS and TSR Agreements, ADM will continue to suffer severe and irreparable injury for which it has no adequate remedy at law.

Affiant Further Sayeth Not.

_____
Samuel Kancherlapalli

Subscribed and sworn to
before me this 10th day
of December, 2007.

_____
Notary Public

```
OFFICIAL SEAL
MARA KALNINS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/07/09
```

2

# Vice President of Sales Agreement

This agreement made this 21st day of March, 2006 by and between Bob Walder hereinafter referred to as the Vice President of Sales "**VPS**" and **American Diagnostic Medicine, Inc.,** a corporation under the laws of the State of Illinois, having its office at 960 Industrial Drive, Suite 7, Elmhurst, Illinois 60126, hereinafter referred to as "**ADM**", is as follows:

**1.    APPOINTMENT AND ACCEPTANCE:**  ADM appoints VPS as its Vice President of Sales to sell the products and services of ADM in the territories and accounts or customers as set forth below and VPS accepts the appointment and agrees to exclusively sell and promote the sale of ADM's products and services.

**2.    TERRITORY:**  VPS's territories and/or accounts shall consist of the following:

All Hospitals, Multi-Specialty Clinics, Cardiology Practices and other Health Care Providers in the following geographic locations;

Western Territory including Washington, Oregon, California, Arizona, Nevada.

**3.    COMPENSATION:**  VPS compensation for services performed under the terms of this agreement shall be for the sale of certain medical diagnostic imaging equipment, whether through operating leases, joint ventures, traditional capital leases or outright purchases or other types of services supplied under the terms of this agreement. Please refer to **EXHIBIT A** for detailed information concerning compensation.

   **a.**    It is the responsibility of the VPS to obtain advanced authorization from ADM on all special circumstances involving compensation not covered by this Agreement.   Any special arrangements, which are agreed upon, by ADM and the VPS must be communicated in writing.
   **b.**    Sales efforts and in turn commissions due on all new accounts will be governed by the territories applicable to this agreement if the decision making / buying power resides within the territory for each specific customer and/or account.
   **c.**    The commission shall be paid to the VPS based on the schedule shown in **EXHIBIT A.** Commission checks shall be paid on a 1099 form to VPS.
   **d.**    ADM shall pay for or reimburse VPS for all travel costs relating to obtaining business under the terms of this Agreement.  Such travel costs may include, transportation (airfare, rental cars), mileage reimbursement, lodging, entertainment, phone calls, etc.). VPS shall provide to ADM at its principal office detailed expense reports on ADM expense report forms.  Each expense report shall detail the reason for travel and well as who was visited.   Expense reports turned in after thirty (30) days shall not be eligible for reimbursement.   All travel arrangements and costs must comply with ADM travel policies and be pre-approved by ADM.

**4.    ACCEPTANCE OF CONTRACTS:**  All contracts are subject to acceptance or rejection by an authorized officer of ADM.  ADM shall be responsible for all credit risks and collections.  If ADM notifies customer of its acceptance or rejection of any contact, a copy shall be transmitted to the VPS.

**5.    TERMS OF SALE:**  ADM shall provide VPS with a current price schedule / quotation, which shall be subject to change upon ninety (90) days notice.   Representative may quote to prospective customers from this price list provided but no quote shall be valid for more than ninety (90) days.  All other sales shall be at prices and upon terms established by ADM.  ADM shall have the right, in its sole discretion, from time to time, to establish, change, alter, or amend prices and other terms and conditions of sale. VPS shall not accept orders in ADM's name and shall not make price quotations or delivery promises for items not specifically on the current price


EXHIBIT
A

information, file layouts, marketing strategies, business, product or acquisition plans, current business relationships or strategies and customer lists. "Proprietary Information" shall not include information which: (i) may be publicly disclosed by the party disclosing the information either prior to or subsequent to the receipt of such information by the receiving party; (ii) shall become generally known in the trade through no fault of the receiving party; (iii) may be lawfully disclosed to the receiving party by a third person to this Agreement who has lawfully acquired Proprietary Information (iv) was independently developed by the receiving party; or (v) is required to be disclosed pursuant to a duly authorized subpoena, court order, or government authority, in which event the receiving party shall provide prompt written notice to the disclosing party prior to such disclosure, so that the disclosing party may seek a protective order or other appropriate remedy.  In any event, the receiving party hereby acknowledges and agrees that, if such party shall seek to disclose, divulge, reveal, report, publish, transfer or use, for any purpose whatsoever, any Proprietary Information, such party shall bear the burden of proving that any such information is subject to one of the exceptions identified herein.

   **b.**   Treatment of Information.

VPS acknowledges that, in and as a result of employment, and/or discussions with ADM's agents, vendors, officers and employees, VPS shall or may be making use of or acquiring Proprietary Information.  As a material inducement to disclose such Proprietary Information, VPS covenants and agrees that it shall not, except with the prior written consent of ADM, at any time directly by itself or indirectly through any agent or employee:  (i) copy, modify, disclose, divulge, reveal, report, publish or transfer to any person or entity, for any purpose whatsoever, any Proprietary Information or (ii) use Proprietary Information for any purpose other than in connection with the consummation of the Proposed Transactions in ADM's clinic best interest.  Failure to mark any of the Proprietary Information as confidential protected or Proprietary Information shall not affect its status as part of the Proprietary Information under the terms of this Agreement.

   **c.**   Ownership of Information.

VPS covenants and agrees that all right, title and interest in any Proprietary Information shall be and shall remain the exclusive property of ADM.

   **d.**   Injunctive Relief.

VPS understands and agrees that ADM shall suffer irreparable harm in the event of a breach of any obligations under this Agreement and the monetary damages shall be inadequate to compensate ADM for such breach.  Accordingly, VPS agrees that, in the event of a breach or threatened breach of any of the provisions of this Agreement, in addition to and not in limitation of any other rights, remedies or damages available at law or in equity, ADM shall be entitled to a temporary restraining order, preliminary injunction and permanent injunction in order to prevent or restrain any such breach.

   **e.**   Materials.

All notes, data, tapes, reference items, sketches, drawings, memoranda, manuals, documentation, records and other materials in any way relating to any of the Proprietary Information or to ADM's business shall belong exclusively to ADM and VPS to turn over all copies of such materials and any Proprietary Information in the VPS's possession or control at the request of ADM.

   **f.**   Nature of the Information.

Although the Proprietary Information contains information which is relevant for day-to-day operation of the company, ADM makes no representations or warranties, express or implied, as to the accuracy or completeness of the Proprietary Information.  ADM shall not have any liability to the other party relating to or arising from the use of the Proprietary Information according to the terms of this Agreement.  Neither party represents or warrants that Proprietary Information disclosed hereunder will not infringe any third party's patents, copyrights, trade secrets or other proprietary rights of others.

   **g.**   Reasonableness of Restrictions; Severability.

EACH PARTY HAS CAREFULLY READ AND CONSIDERED THE PROVISIONS OF THIS SECTION HEREOF INCLUSIVE AND, HAVING DONE SO, AGREES THAT THE RESTRICTIONS SET FORTH IN SUCH ARTICLES ARE FAIR AND REASONABLE AND ARE REASONABLY REQUIRED FOR THE PROTECTION OF THE INTERESTS OF THE PARTIES AND ITS BUSINESS, OFFICERS, DIRECTORS

list, without ADM's approval.

**6.    VPS'S RELATIONSHIP & CONDUCT OF BUSINESS:** VPS shall maintain its own sales organization within its assigned territories and shall use its best efforts and devote such time as may be necessary to sell and promote the sale of ADM's products and services and perform reasonable after-sale and follow-up functions as well as a liaison between ADM and customers within the territory. VPS agrees not to represent other companies while in employment with ADM or enter into a competitive business while under employment with ADM.

**a.**  Specific obligations of the VPS will include: Sales Lead Generation, Phone Solicitation, Written Sales Quotations, Contracts and Contract Negotiations, Sales Presentations, Trade Show Attendance and follow-up to potential customers.

**b.**    Any sales lead generated by VPS must immediately (within twenty-four hours) be conveyed via e-mail to the Sales Administrator.  Follow-up calls, correspondences or sales quotes by the VPS must immediately (within twenty-four hours) conveyed via e-mail to the Sales Administrator. Weekly activity reports must be e-mailed no latter than 4:00 PM CST every Friday (No exception for holidays).   Monthly forecast and outlooks must be e-mailed no latter than 4:00 PM CST on the last business day of every month (No exception for holidays).

**c.**  VPS shall conduct all of his business in a professional manner in ADM's name and dress professionally and well groomed.

**d.**    The VPS shall not, without ADM's prior approval, alter, enlarge, or limit orders, make representations, guarantees concerning ADM's product and services or accept the return of, or make any allowances for such products and services whether written or orally.

**7.    TERMINATION:** This agreement shall be enforce until canceled.  Either party may cancel at any time, by giving written notice to the other party by email, fax or certified mail.  Upon termination of this agreement the following applies;

**a.**    Any violation of the terms of this agreement shall be grounds for immediate termination and VPS shall not be eligible for any commissions owed on confirmed or pending contracts.

**b.**    If VPS elects to terminate this agreement and is not in violation of any of the terms of this agreement, ADM will compensate VPS for signed contracts not yet accepted at our own discretion. Electing to terminate this agreement, does not obligate ADM to make any further commission payments.

**c.**    If ADM terminates this agreement and VPS is not in violation of this agreement ADM will compensate the VPS at a rate which is mutually acceptable, but under no circumstance not to exceed 50% of the agreed upon compensation rate as detailed in Exhibit A for account still owed to VPS.  Commissions will be paid no later than 30 days after the Delivery and Acceptance date. Accounts signed but not Accepted by customer within 90 (ninety) days of the termination date shall not be eligible for commissions.  Commissions on all future contract renewals will not apply.

**8.    NON-DISCLOSURE:** WHEREAS ADM is prepared to disclose certain confidential information regarding the formation, financing, acquisitions, and operations of its accounts concerning diagnostic imaging and other related business in the United States. And, WHEREAS ADM under this agreement wishes to protect this information by insuring that it not be disclosed to anyone without their written permission, and WHEREAS the signatories wish to spell out the exact methods by which they will protect this information. NOW THEREFORE, the signatories mutually covenant and agree as follows:

**a.**    Definition of Proprietary Information.
For purposes of this Agreement, the term "Proprietary Information" shall mean all of the information, data and software furnished by ADM to VPS, whether in oral, written, graphic or machine-readable form, which may include but not be limited to names of other entities interested in acquiring an ownership interest in ADM, financial statements, corporate and stock

AND EMPLOYEES. Each party further agrees that the restrictions set forth in this Agreement shall not impair either party's ability to do business within field or fields of its choice including, without limitation, those areas in which such party is, to be or has done business. The provisions of this Agreement shall be deemed severable, and invalidity or unenforceability of any one or more of the provisions hereof shall not affect the validity and enforceability of the other provisions hereof.

**9.   NOT COMPETE:** For good consideration and as an inducement for ADM to employ VPS, VPS hereby agrees not to directly or indirectly compete with the business of ADM and its successors and assigns during the period of employment and for a period of 1 year following the termination of VPS and notwithstanding the cause or reason for termination. The term "not compete" as used herein shall mean that the VPS shall not own, manage, operate, consult or to be employee in a business substantially similar to or competitive with the present business of ADM or such other business activity in which ADM may substantially engage during the term of employment.

**10.   SETTLEMENT OF DISPUTES:**   The parties agree that any disputes or questions arising hereunder including the construction or application of this agreement may be settled by arbitration in accordance with the rules of the American Arbitration Association then enforce. The American Arbitration Association shall name a panel of five arbitrators and ADM shall then strike two names and the remaining names shall be the arbitrator.  The decision of the arbitrator shall be final and binding upon the parties both as to law and to fact and shall not be appealable to any court in any jurisdiction.  Both parties shall share the expenses of the arbitrator equally unless the arbitrator determines that the expenses shall be otherwise assessed.  The prevailing party in any lawsuit shall recover reasonable attorney fees and costs incurred from each other.

**11.   GENERAL:**   This agreement contains the entire understanding of the parties, and shall supersede any other oral or written agreement and shall insure to the benefit of ADM or any of its successors and assigns. This agreement may not be modified in any way without consent of both parties. Nothing in the agreement shall be construed to constitute the VPS as the partner of ADM nor shall either party have any authority to bind the other in any respect, it being intended that each shall remain an independent contractor responsible for only its own actions.

**12.   CONSTRUCTION OF AGREEMENT:**   This agreement shall be construed according to the laws of the state of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first written in multiple counterparts, each of which shall be considered an original.

*ADM:*

**American Diagnostic Medicine, Inc.**

Printed Name:_____

Signature:_____

Title:_____

*VPS: Vice President of Sales*

_____

Signature:_____

# EXHIBIT A
*Compensation & Commission Rates*

**VPS Compensation:**
ADM shall pay VPS a base annually salary of $132,000.00 to be paid bi-monthly on the 1st and 15th of each calendar month.

**Employee Benefits:**
- Health Insurance & Drug Prescription
- Dental Insurance
- Retirement Fund – Company 401(k), non-matching
- Short Term & Long-Term Disability
- Life Insurance
 (Please contact Janet Hausenbauer at 800.262.9645, ext. 109 for additional details of benefits & cost)

**Paid Vacation:**
- Two (2) weeks paid vacation after the first 12 months of employment
- Three (3) weeks paid vacation after 5 years of employment
- Four (4) weeks paid vacation after 10 years of employment
- Paid Holidays including New Years Day, Memorial Day, Labor Day, July 4th, Thanksgiving Day and Christmas Day.
- Each Employee receives 3 sick days and 2 personal days per year

**Other Incentives:**
- Car allowance of $500.00 monthly to be paid bi-monthly on the same schedule as VPS compensation listed above

**Fee- per-Exam Operating Leases**
**Fixed Site Commission Schedule**

**Commissions paid on new nuclear fixed site accounts:**

| | |
|---|---|
| 60 month contract  w/ minimums | 10,000 |
| 48 month contract w/ minimums | 8,000 |
| 36 month contract w/ minimums | 6,000 |
| 24 month contract | 4,000 |
| 12 month contract | 2,000 |

**Commissions paid on new 64 slice CT fixed site accounts (50% until September 30, 2006, 100% thereafter):**

| | |
|---|---|
| 60 month contract  w/ minimums | 15,000 |
| 48 month contract w/ minimums | 12,000 |

**Commissions paid to vice president of sales on fixed site contract by sales rep (paid upon D&A):**

| | |
|---|---|
| 60 month w/minimums | 1,000 |
| 48 month w/ minimums | 800 |
| 36 month contract | 600 |
| 24 month contract | 400 |
| 12 month contract | 200 |

Page 5 of 7

# EXHIBIT A
*Compensation & Commission Rates*

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.

The commissions will be paid to the TSR based on the following payment schedule:
- 25% paid upon signed contract and credit approval
- 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.
- 25% paid in the pay period after 2 full scanning months and based on the following criteria
    1. Patient volume at site must be 51-74% of what is projected to receive 50% of back end commission
    2. Patient volume at 75-99% will receive 75% of back end commission
    3. Patient volume at 100-124% will receive the full back end commission
    4. Patient volume 125- 150% will receive 125% of back end commission
    5. Patient volume at >150% will receive 150% of back end commission

## Fee- per-Exam Operating Leases
## Mobile Commission Schedule

### Commissions paid on new mobile accounts:

| | |
|---|---|
| 12 month contract  w/ 4 days/month | 4,000 |
| 12 month contract  w/ 3 days/month | 3,200 |
| 12 month contract  w/ 2 days/month | 2,000 |
| 12 month contract  w/ 1 day/month | 800 |

### Commissions paid to vice president of sales on new mobile contract by sales rep (paid upon D&A):

| | |
|---|---|
| 12 month contract  w/ 4 days/month | 500 |
| 12 month contract  w/ 3 days/month | 375 |
| 12 month contract  w/ 2 days/month | 250 |
| 12 month contract  w/ 1 day/month | 125 |

### Commissions paid on renewed mobile accounts:

| | |
|---|---|
| 12 month contract  w/ 4 days/month | 2,000 |
| 12 month contract  w/ 3 days/month | 1,600 |
| 12 month contract  w/ 2 days/month | 1,000 |
| 12 month contract  w/ 1 day/month | 400 |

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.

The commissions will be paid to the TSR based on the following payment schedule:
- 50% paid upon signed signed contract and credit approval

- 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.

*ADM reserves the right to change or modify the commission rates and payment schedule with 30 days advance notice to the VPS.*

**AGREED AND ACCEPTED:**

ADM

Signature:_____

**AGREED AND ACCEPTED:**

VPS        Bob Walder

Signature:_____

May 08 06 11:42a     Paul Kaplan                    9258750085                        p.?

# Territory Sales Representative Agreement

This agreement made this 8th day of May, 2006 by and between Paul Kaplan hereinafter referred to as the Territory Sales Representative "TSR" and **American Diagnostic Medicine**, Inc., a corporation under the laws of the State of Illinois, having its office at 960 Industrial Drive, Suite 7, Elmhurst, Illinois 60126, hereinafter referred to as "**ADM**", is as follows:

**1. APPOINTMENT AND ACCEPTANCE:** ADM appoints TSR as its Territory Sales Representative to sell the products and services of ADM in the territories and accounts or customers as set forth below and TSR accepts the appointment and agrees to exclusively sell and promote the sale of ADM's products and services.

**2. TERRITORY:** TSR's territories and/or accounts shall consist of the following:

All Hospitals, Multi-Specialty Clinics, Cardiology Practices and other Health Care Providers in the following geographic locations;

California

**3. COMPENSATION:** TSR compensation for services performed under the terms of this agreement shall be for the sale of certain medical diagnostic imaging equipment, whether through operating leases, joint ventures, traditional capital leases or outright purchases or other types of services supplied under the terms of this agreement. Please refer to **EXHIBIT A** for detailed information concerning compensation.

    **a.** It is the responsibility of the TSR to obtain advanced authorization from ADM on all special circumstances involving compensation not covered by this Agreement. Any special arrangements, which are agreed upon, by ADM and the TSR must be communicated in writing.
    **b.** Sales efforts and in turn commissions due on all new accounts will be governed by the territories applicable to this agreement if the decision making / buying power resides within the territory for each specific customer and/or account.
    **c.** The commission shall be paid to the TSR based on the schedule shown in **EXHIBIT A.** Commission checks shall be paid on a 1099 form to TSR.
    **d.** ADM shall pay for or reimburse TSR for all travel costs relating to obtaining business under the terms of this Agreement. Such travel costs may include, transportation (airfare, rental cars), mileage reimbursement, lodging, entertainment, phone calls, etc.). TSR shall provide to ADM at its principal office detailed expense reports on ADM expense report forms. Each expense report shall detail the reason for travel and well as who was visited. Expense reports turned in after thirty (30) days shall not be eligible for reimbursement. All travel arrangements and costs must comply with ADM travel policies and be pre-approved by ADM.

**4. ACCEPTANCE OF CONTRACTS:** All contracts are subject to acceptance or rejection by an authorized officer of ADM. ADM shall be responsible for all credit risks and collections. If ADM notifies customer of its acceptance or rejection of any contact, a copy shall be transmitted to the TSR.

**5. TERMS OF SALE:** ADM shall provide TSR with a current price schedule / quotation, which shall be subject to change upon ninety (90) days notice. Representative may quote to prospective customers from this price list provided but no quote shall be valid for more than ninety (90) days. All other sales shall be at prices and upon terms established by ADM. ADM shall have the right, in its sole discretion, from time to time, to establish, change, alter, or amend prices and other terms and conditions of sale. TSR shall not accept orders in ADM's name and shall not make price quotations or delivery promises for items not specifically on the current price



EXHIBIT

B

May 08 06 11:42a      Paul Kaplan                          9259750685                    p.3

list, without ADM's approval.

**6.    TSR'S RELATIONSHIP & CONDUCT OF BUSINESS:** TSR shall maintain its own sales organization within its assigned territories and shall use its best efforts and devote such time as may be necessary to sell and promote the sale of ADM's products and services and perform reasonable after-sale and follow-up functions as well as a liaison between ADM and customers within the territory. TSR agrees not to represent other companies while in employment with ADM or enter into a competitive business while under employment with ADM.

**a.** Specific obligations of the TSR will include: Sales Lead Generation, Phone Solicitation, Written Sales Quotations, Contracts and Contract Negotiations, Sales Presentations, Trade Show Attendance and follow-up to potential customers.

**b.** Any sales lead generated by TSR must immediately (within twenty-four hours) be conveyed via e-mail to the Sales Administrator. Follow-up calls, correspondences or sales quotes by the TSR must immediately (within twenty-four hours) conveyed via e-mail to the Sales Administrator. Weekly activity reports must be e-mailed no latter than 4:00 PM CST every Friday (No exception for holidays). Monthly forecast and outlooks must be e-mailed no later than 4:00 PM CST on the last business day of every month (No exception for holidays).

**c.** TSR shall conduct all of his business in a professional manner in ADM's name and dress professionally and well groomed.

**d.** The TSR shall not, without ADM's prior approval, alter, enlarge, or limit orders, make representations, guarantees concerning ADM's product and services or accept the return of, or make any allowances for such products and services whether written or orally.

**7.    TERMINATION:** This agreement shall be enforce until canceled. Either party may cancel at any time, by giving written notice to the other party by email, fax or certified mail. Upon termination of this agreement the following applies;

**a.** Any violation of the terms of this agreement shall be grounds for immediate termination and TSR shall not be eligible for any commissions owed on confirmed or pending contracts.

**b.** If TSR elects to terminate this agreement and is not in violation of any of the terms of this agreement, ADM will compensate TSR for signed contracts not yet accepted at our own discretion. Electing to terminate this agreement, does not obligate ADM to make any further commission payments.

**c.** If ADM terminates this agreement and TSR is not in violation of this agreement ADM will compensate the TSR at a rate which is mutually acceptable, but under no circumstance not to exceed 50% of the agreed upon compensation rate as detailed in Exhibit A for account still owed to TSR. Commissions will be paid no later than 30 days after the Delivery and Acceptance date. Accounts signed but not Accepted by customer within 90 (ninety) days of the termination date shall not be eligible for commissions. Commissions on all future contract renewals will not apply.

**8.    NON-DISCLOSURE:** WHEREAS ADM is prepared to disclose certain confidential information regarding the formation, financing, acquisitions, and operations of its accounts concerning diagnostic imaging and other related business in the United States. And, WHEREAS ADM under this agreement wishes to protect this information by insuring that it not be disclosed to anyone without their written permission, and WHEREAS the signatories wish to spell out the exact methods by which they will protect this information. NOW THEREFORE, the signatories mutually covenant and agree as follows:

**b.** Treatment of Information.
TSR acknowledges that, in and as a result of employment, and/or discussions with ADM's agents, vendors, officers and employees, TSR shall or may be making use of or acquiring Proprietary Information. As a material inducement to disclose such Proprietary Information, TSR covenants

May 08 06 11:42a     Paul Kaplan                           9258750695                    p.4

and agrees that it shall not, except with the prior written consent of ADM, at any time directly by itself or indirectly through any agent or employee: (i) copy, modify, disclose, divulge, reveal, report, publish or transfer to any person or entity, for any purpose whatsoever, any Proprietary Information or (ii) use Proprietary Information for any purpose other than in connection with the consummation of the Proposed Transactions in ADM's clinic best interest. Failure to mark any of the Proprietary Information as confidential protected or Proprietary Information shall not affect its status as part of the Proprietary Information under the terms of this Agreement.

    **c.**   Ownership of Information.

TSR covenants and agrees that all right, title and interest in any Proprietary Information shall be and shall remain the exclusive property of ADM.

**9.**   **SETTLEMENT OF DISPUTES:** The parties agree that any disputes or questions arising hereunder including the construction or application of this agreement may be settled by arbitration in accordance with the rules of the American Arbitration Association then enforce. The American Arbitration Association shall name a panel of five arbitrators and ADM shall then strike two names and the remaining names shall be the arbitrator. The decision of the arbitrator shall be final and binding upon the parties both as to law and to fact and shall not be appealable to any court in any jurisdiction. Both parties shall share the expenses of the arbitrator equally unless the arbitrator determines that the expenses shall be otherwise assessed. The prevailing party in any lawsuit shall recover reasonable attorney fees and costs incurred from each other.

**10.**   **LEGAL INVLOVING PRIOR EMPLOYER:** The parties agree that any disputes, questions, concerns and legal actions arising from Paul Kaplan joining ADM (American Diagnostic Medicine) as a TSR (Territory Sales Representative) regarding non disclosure, hiring of TSR or any legal dispute pertaining to relationship with TSR as an ADM employee involving relationship with former employer Digirad Corporation and it's subsidiaries Digirad Imaging Solutions, known as hybrid sales person (Territory Manager / Imaging Solutions Expert) American Diagnostic Medicine agrees to completely and fully cover all legal and financial responsibilities for Paul Kaplan.

**11.**   **GENERAL:** This agreement contains the entire understanding of the parties, and shall supersede any other oral or written agreement and shall insure to the benefit of ADM or any of its successors and assigns. This agreement may not be modified in any way without consent of both parties. Nothing in the agreement shall be construed to constitute the TSR as the partner of ADM nor shall either party have any authority to bind the other in any respect, it being intended that each shall remain an independent contractor responsible for only its own actions.

**12.**   **CONSTRUCTION OF AGREEMENT:** This agreement shall be construed according to the laws of the state of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first written in multiple counterparts, each of which shall be considered an original.

*ADM:*

**American Diagnostic Medicine, Inc.**

Printed Name: _____

Signature: _____

Title: _____

*TSR: Territory Sales Representative*

*PAUL KAPLAN*

Signature: *Paul Kaplan 5-8-06*

Mar 08 06 11:43a    Paul Kaplan                9258750685              p.5

# EXHIBIT A
## Compensation & Commission Rates

**TSR Compensation:**
ADM shall pay TSR a base annually salary of $95,000.00 to be paid bi-monthly on the 1st and 15th of each calendar month.

**Employee Benefits:**
- Health Insurance & Drug Prescription begins June 12, 2006
- Dental Insurance begins June 12, 2006
- Retirement Fund – Company 401(k), non-matching begins June 12, 2006
- Short Term & Long-Term Disability begins June 12, 2006
- Life Insurance begins June 12, 2006
  (Please contact Janet Hausenbauer at 800.262.9645, ext. 109 for additional details of benefits & cost)

**Paid Vacation:**
- Three (3) weeks paid vacation after the first 6 months of employment
- Four (4) weeks paid vacation after 5 years of employment
- Paid Holidays including New Years Day, Memorial Day, Labor Day, July 4th, Thanksgiving Day and Christmas Day.
- Each Employee receives 3 sick days and 2 personal days per year

**Other Incentives:**
- Car allowance is $500.00 monthly beginning June 12, 2006 and covers all fuel while using the car for all business use of vehicle. Car Allowance to be paid bi-monthly on the same schedule as TSR compensation listed above.

### Fee- per-Exam Operating Leases
### Fixed Site Commission Schedule

**Commissions paid on new nuclear fixed site accounts:**

| | |
|---|---|
| 60 month contract w/ minimums | 9,000 |
| 48 month contract w/ minimums | 7,200 |
| 36 month contract w/ minimums | 5,400 |
| 24 month contract | 3,600 |
| 12 month contract | 1,800 |

**Commissions paid on new 64 slice CT fixed site accounts (50% until September 30, 2006, 100% thereafter):**

| | |
|---|---|
| 60 month contract w/ minimums | 15,000 |
| 48 month contract w/ minimums | 12,000 |

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.
The commissions will be paid to the TSR based on the following payment schedule:
- 25% paid upon signed contract and credit approval
- 50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.

May 08 06 11:43a      Paul Kaplan                    9258750685                    p.6

# EXHIBIT A

## *Compensation & Commission Rates*

· 25% paid in the pay period after 2 full scanning months and based on the following criteria
1. Patient volume at site must be 51-74% of what is projected to receive 50% of back end commission
2. Patient volume at 75-99% will receive 75% of back end commission
3. Patient volume at 100-124% will receive the full back end commission
4. Patient volume 125- 150% will receive 125% of back end commission
5. Patient volume at >150% will receive 150% of back end commission

### Fee- per-Exam Operating Leases
### Mobile Commission Schedule

**Commissions paid on new mobile accounts:**

- 12 month contract  w/ 4 days/month          4,000
- 12 month contract  w/ 3 days/month          3,200
- 12 month contract  w/ 2 days/month          2,000
- 12 month contract  w/ 1 day/month            800

**Commissions paid on renewed mobile accounts:**

- 12 month contract  w/ 4 days/month          2,000
- 12 month contract  w/ 3 days/month          1,600
- 12 month contract  w/ 2 days/month          1,000
- 12 month contract  w/ 1 day/month            400

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.
The commissions will be paid to the TSR based on the following payment schedule:
· 50% paid upon signed signed contract and credit approval
  50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.

*ADM reserves the right to change or modify the commission rates and payment schedule with 30 days advance notice to the TSR.*

**AGREED AND ACCEPTED:**                      **AGREED AND ACCEPTED:**

ADM                                           TSR        Paul Kaplan

Signature: _____               Signature: _____ 5-8-06

Page 5 of 5

May 08 06 11:43a    Paul Kaplan                              9258750685                     p.6

# EXHIBIT A
### *Compensation & Commission Rates*

· 25% paid in the pay period after 2 full scanning months and based on the following criteria
1. Patient volume at site must be 51-74% of what is projected to receive 50% of back end commission
2. Patient volume at 75-99% will receive 75% of back end commission
3. Patient volume at 100-124% will receive the full back end commission
4. Patient volume 125- 150% will receive 125% of back end commission
5. Patient volume at >150% will receive 150% of back end commission

### Fee- per-Exam Operating Leases
### Mobile Commission Schedule

**Commissions paid on new mobile accounts:**

| | |
|---|---|
| ◦ 12 month contract w/ 4 days/month | 4,000 |
| ◦ 12 month contract w/ 3 days/month | 3,200 |
| ◦ 12 month contract w/ 2 days/month | 2,000 |
| ◦ 12 month contract w/ 1 day/month | 800 |

**Commissions paid on renewed mobile accounts:**

| | |
|---|---|
| ◦ 12 month contract w/ 4 days/month | 2,000 |
| ◦ 12 month contract w/ 3 days/month | 1,600 |
| ◦ 12 month contract w/ 2 days/month | 1,000 |
| ◦ 12 month contract w/ 1 day/month | 400 |

The commission will be paid to the TSR handling the account from initial contact, negotiations to signed contracts.
The commissions will be paid to the TSR based on the following payment schedule:
· 50% paid upon signed signed contract and credit approval
  50% paid after the Delivery & Acceptance (D & A) by the customer and when funds are released by the lending institution to ADM.

*ADM reserves the right to change or modify the commission rates and payment schedule with 30 days advance notice to the TSR.*

**AGREED AND ACCEPTED:**                    **AGREED AND ACCEPTED:**

ADM                                          TSR        Paul Kaplan

Signature: _____ _ __            Signature: _Paul Kaplan_ 5-8-06

Page 5 of 5

# CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

**This Confidentiality and Non-Disclosure Agreement** is entered into as of July 23, 2007 (this "Agreement" between Michele Draper, an individual with an address of

————————, ————————, ——————, and Brandon Walton, Paul Kaplan and Robert Walder dba Core Medical Imaging ("Company") with an address of Corona, CA.

## RECITALS:

1. Company has certain propriety or confidential information and know-how, including, but not limited to, information or know-hoe relating to nuclear molecular imaging technologies and services.
2. Solely for purposes of enabling the Recipient to understand the nature of the Company and explore the possibility of entering into a business arrangement with the Company (the "Purpose"), Company may disclose to the Recipient certain Information on the terns and conditions set forth in this Agreement,
3. Company and the Recipient consider their relationship on of confidence with respect to Information and agree that Information constitutes valuable trade secrets or other intellectual property rights belonging to Company.

Accordingly, the parties agree as follows:

1. The Recipient hereby agrees as follows:
   a. To hold information in strict confidence, to exercise appropriate caution to maintain its secrecy and to prevent unauthorized use of Information and not to disclose, discuss, communicate or transmit information to others (including, without limitations, to any person other than those persons necessary to accomplish the Purpose and then only so long as such persons are bound by confidentiality and non disclosure agreements comparable to the terms of this Agreement, copies of which shall be provided by Company.
   b. To use Information solely for the Purpose and not to use the Information for any other purpose, including without limitation for the purpose of deriving any commercial or other benefit or advantage.
2. The Obligation of the Recipient to maintain the confidentiality of Information shall not apply to any of the Information that the Recipient can reasonably demonstrate by written record was independently known to or developed by the Recipient prior to and independent of the disclosure of Information by the Company to the Recipient or is or has become publicly known through no fault of the Recipient.
3. The Recipient will promptly return to Company all Information supplied in documentary or in computer form or in any other form and any copies thereof, within three (3) days of a written request of Company or upon completion of the Purpose, and destroy any and all other information, notes, documents, test results or other materials produced by Company or Recipient based upon the Information or otherwise in connection with the Purpose.
4. If Recipient or any of its employees, agents or subcontractors conceives, develops or reduces to practice any modification, improvement, alteration, technology, idea, concept, invention, discovery or design as a result of receipt of Information or the evaluation thereof ("Developments"), such Developments shall constitute the sole property of

EXHIBIT
C

Company. Should Company elect to file a patient application for such Development or to otherwise seek protection, Recipient (and will cause each person or entity employed or engaged by or acting on behalf of Recipient to execute) any document necessary to enable Company to do so, including, but not limited to , declarations, powers of attorney and assignments.

5. Recipient acknowledges that any violation of this Agreement will cause Company immediate and irreparable harm which money damages cannot adequately remedy and further agrees that upon any actual or threatened violation of this Agreement, Recipient consents to the issuance by any court of competent jurisdiction of a restraining order or other injunction, without bond, restraining or enjoining such violations by Recipient or any entity or person acting in concert with Recipient. Recipient understands that such relief is additional to and does not limit the availability to Company of any other remedy.

6. The Recipient's obligations and duties to this Agreement shall be effective and binding during the performance by Recipient of any services (if any) and until such Information is in the public domain through no fault of the Recipient. Notwithstanding the foregoing, there shall be no time limit on the Recipient's obligation to refrain fro using any Information in violation of the terms on this Agreement.

7. This Agreement constitutes the entire Agreement between the parties concerning the confidentiality and non-disclosure of Information and may only be modified in a written agreement signed by both parties. The terms and provisions hereof shall be for the benefit of the parties and their successors and assigns.

8. This agreement does not create any legally binding obligations except for the obligations with respect to the Information set forth in this Agreement. Nothing in this Agreement shall be construed as granting or conferring any rights by license or otherwise in any intellectual property included within the Information. This Agreement shall not constitute or establish any relationship among the parties other than that of independent contractors, and none of the parties shall hold themselves out as, ort otherwise represent that it is, the agent, principal or partner of the other.

9. This Agreement shall be governed by and construes and enforced in accordance with the internal laws of the State of California and the parties irrevocably and unconditionally consent to submit to the jurisdiction of the courts of that State to the federal courts located therein, for any action, suit, or proceeding arising out of or relating to this Agreement. Any written notice to be given to Company hereunder shall be sent directly to Company at the address set forth above, attention of Robert Walder, PA-C, PA-CV.

IN WITNESS WEHEREOF, the undersigned parties have executed and delivered this Agreement effective as of the date first above written:

**CORE MEDICAL IMAGING**

By: _____

Robert Walder, PA-C, PA-CV

Recipient:

By: _____

Michele Draper

*(handwritten, left margin)* 165,000 corr / 26.00 rev / 200,000 maint / 24,000 / $224,000

*(handwritten, right margin)* No. CA - / So. CA - / Nevada - / 9 people / 9,253 pers

**California**
Paul Kaplan
Nuclear Medicine
For May 2007

G&A Rate
Salary&Expenses

0.171118303
12,139.18

| | Southern CAM01 | Sacramento CAM02 | San Jose CAM03 | Pleasanton CAM04 | Pleasanton #2 CAM05 | Fresno | Feeney & Vaughan | Total |
|---|---|---|---|---|---|---|---|---|
| Finance Income | | | | | | | | |
| Service Income | 35,033 | 19,205 | 31,994 | 42,728 | 52,962 | 26,591 | 37,704 | 208,423 |
| **Total Revenue** | 35,033 | 19,205 | 31,994 | 42,728 | 52,962 | 26,591 | 37,704 | 245,126 |
| Pharmaceuticals | 11,225 | 7,109 | 9,952 | 16,138 | 18,882 | 9,159 | 11,717 | 84,181 |
| **Total Cost of Sales** | 11,225 | 7,109 | 9,952 | 16,138 | 18,882 | 9,159 | 11,717 | 84,181 |
| **Gross Profit** | 23,807 | 12,097 | 23,042 | 26,591 | 34,080 | 17,342 | 25,987 | 161,945 |
| Mobile Fuel | 1,158 | 1,434 | 984 | 1,437 | 885 | | | 5,899 |
| Mobile Maintenance | 30 | 30 | 438 | 350 | | | | 848 |
| Freight Expense | 163 | 163 | 99 | | | | | 99 |
| License & Permits | 242 | 163 | 163 | | | | | 667 |
| Office Supplies | 242 | | | | | 178 | | 242 |
| Office Maintenance | 3 | | 96 | | | | | 100 |
| Medical Supplies | 934 | 702 | 1,256 | 1,068 | 1,927 | 1,347 | 1,861 | 9,695 |
| Equip Maint Parts | 169 | | 124 | | 112 | | | 169 |
| Telephone Expense | 1,323 | | 3,533 | 81 | 183 | | | 236 |
| Travel Expenses | 296 | 646 | | | | | | 7,111 |
| Business Meals | 86 | 194 | 37 | | | | | 942 |
| Electricity | 298 | 149 | 239 | 140 | | | | 317 |
| Sewage/t Service | | | 259 | | | | | 855 |
| Salaries/Labor Exp | 15,301 | 11,017 | 5,681 | 14,987 | 15,936 | 13,376 | 7,345 | 93,645 |
| Salaries Travel Tech | | | 7,367 | | | | | 7,367 |
| OASDI-Soc. Secur. | 910 | 654 | 345 | 900 | 973 | 769 | 436 | 4,988 |
| SS Tax Travel Tech | | 100 | 434 | | | | | 533 |
| Medicare Tax Exp | 213 | 153 | 81 | 210 | 228 | 180 | 102 | 1,166 |
| Medicare Travel Tech | | 23 | 153 | | | | | 176 |
| Commission Exp. | | | 5,063 | | | | | 9,838 |
| Rent Expense | 1,360 | 1,692 | 1,275 | 1,855 | 3,659 | 1,125 | | 6,182 |
| Depr-Mach & Equip | 3,356 | 3,902 | 2,211 | 2,169 | | | | 13,793 |
| Depr-Comp. Equip. | 115 | 117 | 15 | | 1,794 | 361 | | 248 |
| Depr Exp-Vehicles | 706 | 670 | 670 | 727 | 942 | 1,428 | | 5,145 |
| Amortization Dep | | | | | | | 438 | 438 |
| Interest Income | (892) | (997) | (258) | | | | | (2,148) |
| Interest Expense | 718 | 1,091 | 710 | 689 | 448 | | | 6,570 |
| Discount on N/P | | | | | | | | 6,912 |
| Sales Expense | 1,228 | 947 | 1,578 | 2,07 | 2,612 | 1,307 | 2,914 | 12,139 |
| G&A Expense | 5,995 | 3,286 | 5,475 | 7,312 | 9,063 | 4,535 | 6,452 | 42,117 |
| **Total Expense** | 34,213 | 27,966 | 37,789 | 34,040 | 38,752 | 24,606 | 28,319 | 225,685 |
| **Net Income (Less)** | | | | | | | | |

*Sacramento Team serviced both mobile route & Feeney & Vaughan

# Sales Department

Totals
Administration
For May 2007

| | Total |
|---|---|
| Office Supplies | 349 |
| Cell Phone Exp. | 1,736 |
| Telephone Expense | 410 |
| Travel Expenses | 7,761 |
| Business Meals | 2,252 |
| Salaries/Labor Exp | 58,290 |
| Car Allowance | 3,500 |
| OASDI-Soc. Secur. | 3,433 |
| Medicare Tax Exp. | 803 |
| Postage | 356 |
| **Total Expenses** | **78,890** |
| **Individual Sales expenses** (Already Accounted for) | 59,505 |
| **Other Sales Expenses** | 19,384 |

# Totals
New Accounts
For May 2007

| | Net Income (Loss) | Total |
|---|---|---|
| **Paul** | | |
| Mobile #1 | | |
| Mobile #2 | | |
| Mobile #3 | | |
| Mobile #4 | | |
| Mobile #5 | | |
| Fresno | | |
| Feeney | | |
| Total | | |
| **Liesa** | | |
| Eastside | 1,331 | |
| Dr. Seda | | |
| Mobile #1 | | |
| Mobile #2 | | |
| Total | | |
| **Jim B** | | |
| Mobile #1 | | |
| Ely | | |
| VA/Kamboj | 4,232 | |
| Pershing | | |
| Humboldt | 2,466 | |
| Total | | |
| **Michael** | | |
| Pampa | | |
| Mobile #1 | | |
| Total | | |
| **BJ** | | |
| Quintela | | |
| Mobile #1 | | |
| Total | | |
| **Glen** | | |
| Mobile #1 | | |
| HGNC | | |
| Total | | |
| | | |
| **Grand Total** | | |
| | | |
| **Other Sales Expenses** | | |

# California

## Current Model

6 patients a day @ 290 + 12 pharms @ 95
20 days full capacity

2880

| | CAM01 |
|---|---|
| Service Income | 57,600 |
| **Total Revenue** | **57,600** |
| | |
| Pharmaceuticals | 17,652 |
| **Total Cost of Sales** | **17,652** |
| | |
| **Gross Profit** | **39,948** |
| | |
| Service | 800 |
| Fuel | 757 |
| Medical Supplies | 2,800 |
| Hub Electricity | 50 |
| Scavenger | 50 |
| Salaries | 12,250 |
| Social Security | 721 |
| Medicare | 169 |
| Rent | 1,500 |
| Depr – Com... | 2,888 |
| Depr – ... | 224 |
| Depr – Leas. | 752 |
| Interest | 784 |
| Sales Expense | 3,308 |
| G&A Expense | 9,678 |
| **Total Expenses** | **36,731** |
| | |
| **Net Income (Loss)** | **3,217** |

*(handwritten: 17% sm income, 1,800)*

## Original Model

8 patients a day @ 290 + 12 pharms @ 95
20 days full capacity

3840

| | CAM01 |
|---|---|
| Service Income | 76,800 |
| **Total Revenue** | **76,800** |
| | |
| Pharmaceuticals | 23,536 |
| **Total Cost of Sales** | **23,536** |
| | |
| **Gross Profit** | **53,264** |
| | |
| Service | 800 |
| Fuel | 757 |
| Medical Supplies | 2,800 |
| Hub Electricity | 50 |
| Scavenger | 50 |
| Salaries | 12,250 |
| Social Security | 721 |
| Medicare | 169 |
| Rent | 1,500 |
| Depr | 2,888 |
| Depr | 224 |
| Depr | 752 |
| Interest | 784 |
| Sales Expense | 3,308 |
| G&A Expense | 9,678 |
| **Total Expenses** | **36,731** |
| | |
| **Net Income (Loss)** | **16,533** |

# California

| | Current Model | Original Model | |
|---|---|---|---|

## Current Model

6 patients a day @ 290 + 12 pharms @ 95
20 days full capacity — 2880

| | CAMO1 |
|---|---|
| Service Income | 57,600 |
| **Total Revenue** | 57,600 |
| Pharmaceuticals | 17,652 |
| **Total Cost of Sales** | 17,652 |
| **Gross Profit** | 39,948 |
| Service | 800 |
| Fuel | 757 |
| Medical Supplies | 2,800 |
| Hub Electricity | 50 |
| Scavenger | 50 |
| Salaries | 12,250 |
| Social Security | 721 |
| Medicare | 169 |
| Rent | 1,500 |
| Depr – Con... | 2,888 |
| Depr – ... | 224 |
| Depr – ... | 752 |
| Interest | 784 |
| Sales Expense | 3,308 |
| G&A Expense | 9,678 |
| **Total Expenses** | 36,731 |
| **Net Income (Loss)** | 3,217 |

*(handwritten: 17% fte ded.   1,800)*

## Original Model

8 patients a day @ 290 + 12 pharms @ 95
20 days full capacity — 3840

| | CAMO1 |
|---|---|
| Service Income | 76,800 |
| **Total Revenue** | 76,800 |
| Pharmaceuticals | 23,536 |
| **Total Cost of Sales** | 23,536 |
| **Gross Profit** | 53,264 |
| Service | 800 |
| Fuel | 757 |
| Medical Supplies | 2,800 |
| Hub Electricity | 50 |
| Scavenger | 50 |
| Salaries | 12,250 |
| Social Security | 721 |
| Medicare | 169 |
| Rent | 1,500 |
| Depr | 2,888 |
| Depr | 224 |
| Depr | 752 |
| Interest | 784 |
| Sales Expense | 3,308 |
| G&A Expense | 9,678 |
| **Total Expenses** | 36,731 |
| **Net Income (Loss)** | 16,533 |